This next case is case number 4-17-0742 in re the Marriage of Diane Cramsey and Richard Cramsey. Appearing for the appellant is attorney Brenner and for the appellee is attorney Schering. Good morning. Good morning. Mr. Brenner, are you ready to proceed? I am ready. All right. Good morning. Good morning. This is a case involving modification of spousal maintenance. The issue was tried in Adams County in August 2017 following the termination of Richard Cramsey's employment in May of 2015. After trial, the court issued a written decision which denied Richard's motion to modify. Speak up a little bit. I'm sorry. That's only a recording device, not an amplifier. Oh, I never realized that. I'm sorry, Justice. In any event, the evidence presented at trial essentially involved the testimony of a lady named Landy Macy, who was the director of human resources for Richard's employer, which was GlaxoSmithKline, the pharmaceutical company. Richard had been employed as a pharmaceutical sales representative. The testimony of Ms. Macy, and I know the court is familiar with the record, but I think there are certain key points which should be pointed out. First, she testified that Richard Cramsey's employment or position was eliminated. He was not replaced by another employee. Second, she testified that hundreds of folks within the pharmaceutical sales force had their job eliminated. Richard was one of them. Lastly, she testified that this was part of global restructuring for GlaxoSmithKline. All of those are important points, but other points which should be emphasized are also important, which is what this termination of employment was not. Number one, it had nothing to do with Richard's performance. Number two, it had nothing to do with the RMA, which we dealt with in the first appeal of this case. It had nothing to do with Richard having taken short-term disability, which again was an issue which we dealt with in the first appeal of this case. And most importantly, it was not voluntary on Richard's part, and it had nothing to do with anything within Richard's control. Based on that, the trial court's first finding certainly seems to be against the manifest weight of the evidence. Now, what should we make of the trial court's statement made after the hearing on the motion to modify where he says, the trial court contemplated the possibility of the respondent retiring due to his age or no longer being employed by GSK by providing for a lien on certain parcels of marital real estate awarded to the respondent to secure future payments of maintenance to the petitioner? Well, that was in the next paragraph of the court's order, and that was something that really had me scratching my head for a second. When the trial court said it contemplated that Richard would no longer be employed by GlaxoSmithKline, I looked back first at the minimum of opinion which the trial court filed following the trial. It said nothing to that effect. Second, I looked at the judgment for dissolution of marriage. Again, that said absolutely nothing about Richard leaving GSK. Then I looked at the transcript of the hearing where Richard had filed a motion to reopen proofs, which was ultimately denied. But what the trial court said there was Richard would be getting basically severance benefits for one year, and accordingly his pay wouldn't change for one year, and anything beyond that would be sheer speculation. Now, what the court said back in, I believe, November of 2014, does not match up what the trial court said in its September 6, 2017 order. I don't know if the court forgot that it spoke those words, but those words are clearly in the record at, I have this written down, R356-357. In terms of the second part, lien on the real estate, again, if we look at the statute, 504 does mention that a lien can be placed on property to secure maintenance, but that is generally to make sure that somebody just doesn't follow the court order and that there is a source of money to make sure that the recipient gets the income. But you have the trial court here saying, and I understand you're saying that there's no evidence in the record that at the time the trial court placed the lien on the parcels of real estate, it was doing so because it contemplated he might be retiring. But at the time of the hearing on the motion to modify, he says, that's why I did it. Why shouldn't we take him at his word? Well, if we look at the cases where a future event is contemplated, what we find is that it is spelled out very, very clearly in the record. If we look at the Newman case, the marital settlement agreement in that case is That's that response to Justice Harris' question that tells us about those cases. What we want to know is, what about this case? Are we supposed to disregard what the trial judge said, or do we, you seem to be implying, disbelieve him? I mean, let's hear it out, counsel. The record in this case doesn't seem to bear what the trial judge said. So therefore what? Therefore what? We disregard it or disbelieve him? Your Honor, I think we have to look at the entire record. See, here's the problem. We're on the felt court right now, otherwise known as the common enemy. But the three of us have spent cumulatively well over 30 years as trial judges, and that's where our sympathy is. And this is Judge Woolihan, who said, that's what I was thinking, well, it was a year and a half, two years earlier in this very case when I made these rulings. And my sympathy is this. I, as a trial judge, frequently thought things with regard to how I was ruling and may very well not have explicated my entire understanding and analysis. And I wouldn't have looked favorably upon someone arguing, well, despite what he said, because at the time he never set it forth. It's really kind of what you're arguing here, isn't it? In essence, yes. Well, isn't that kind of a tough argument to make to the trial court alumni who are sitting here in front of you for this argument? Yes, and I understand the court's questions. But what we have is a statement in the record which is completely contrary to. . . No, not completely contrary. It's just absent. You know, I'm a busy trial judge. I've got a lot of stuff going on here. This is what I'm thinking. I'm thinking reasons A through E for why I'm doing what I'm doing. And I mention A through C. I don't mention D or E. Okay. So, therefore, I couldn't have been thinking those, even though a year and a half later in the same place as I really was? Well, if we look at the totality of things, it just doesn't seem to match with the rest of that particular paragraph. And the statement that . . . Well, that's an excellent diplomatic way of saying we shouldn't believe the trial court. And that's an argument that I just don't see how we can accept, counsel. Well, and I appreciate the court's statement. Because if we . . . Here's the problem. If we do accept the trial court at its word, then what have you got left of this case? Well, what we have is the reasoning set forth by the trial court. And the statement that is being focused on was, I believe, the last sentence of that paragraph. If we look at the paragraph before, which I previously addressed, as well as the other material in that paragraph, as a whole, it does not support the conclusion that was stated by the trial court. I don't know precisely what the trial court remembered from the first hearing. But what I do have is the transcript of what the trial court said. And as you pointed out, Justice Steigman, okay, you can list . . . you can have five different reasons and only mention three, but by the same token . . . And, of course, there's no requirement you mention anything. It's good practice. Very good practice. But on appeal, we're not going to reverse the trial court because the court didn't sufficiently explain its ruling. Well, I think if we look at the whole of the decision, the spousal maintenance component of this was based on the income of the parties. If we go back to the original judgment, it goes through the mathematics of 504. And two-thirds of Richard's income was based on his employment from GSK. That employment is gone, and it's gone forever. The trial court also mentioned that Richard had continued to pay the spousal maintenance over the course of a little bit over two years. But we also had evidence that, number one, he received a year's worth of salary as a severance benefit. And, number two, he had two years of unemployment benefits, which ran out in, I believe, June of 2017, two months before the trial. So, in other words, his income sources had completely dried up in terms of other aspects of the ability to pay. We do have the division of assets from the original judgment for dissolution of marriage. The trial judge said Richard received substantial assets. Well, if we look at the scheme of 510 and 504, it requires the court to look at both parties. Both Richard and Diane received substantial assets. And as a result, I don't think there is too much there. What we have to focus on is the income, because that's the standard that the court adopted in the original judgment for dissolution of marriage. It was based on income. And at the time, 504, as we now know it, had not been enacted. It was going to be enacted in a couple of months, but still 504 is an income-based statute. And to say that it is tied to assets, I think that the court would need to do a little bit more than what it actually did in the judgment for dissolution of marriage. What it did was it adopted Diane's calculations and incorporated those calculations directly into the judgment. Now, under both 510 and 504, which have had a number of modifications in recent years, we really have to focus on the circumstances of both of the parties. And what we have is Diane's side of the equation was never really addressed. She had the ability to access income from Social Security as well as from a very substantial retirement account, which was awarded to her in the divorce, and she had not done so. Richard, on the other hand, his sole source of income was the farm, which has limited means, and most of the land was tied up in government CRP programs, which is something that we're kind of stuck with because it's subject to contract. So we believe that the trial court erred in denying Richard's motion to modify. The bottom line is he was making close to $130,000 a year at GSK. That job disappeared. That is a major change. It's a major impact on just about anyone's income. And the record shows it was two-thirds of his income here. The last point which I throw in is Rule 216, which the reason I mention it is what I am seeing as a practitioner is objections to 216 requests. Not just in Adams County, but in Sangamon, Peoria, Cook County, we are getting requests such as the one here that says, we admit the document, but we reserve all objections, including foundation, hearsay, and anything else. As a result of that, Rule 216 is slowly being rendered meaningless. But what does the rule say? And how was the request phrased? Was it a request to admit the genuineness of certain documents? Yes, it was. Isn't that a very specific request? And while one can admit the genuineness of a document, still retain the objections that might pertain to the admissibility of the document otherwise, such as hearsay, relevance, anything along those lines? I believe it depends on the circumstance. What we were receiving were blanket objections, and that's what I'm seeing. Speak up again. You were receiving what? Blanket objections. Same form every time, objecting to relevance, foundation. Well, let me ask you this way, and following up on Justice Harris' question, the same one I had. It seems to me if you ask under Rule 216 to admit the genuineness of a document, and they say, yes, this is a genuine document, what that means is they're conceding that you need not present any foundation to prove what is this document. Is this the contract or is this whatever it purports to be? Okay, we now have that done, but now the question is, having admitted with no need for a foundation testimony regarding the document, you still need to present evidence or arguments and support with regard to why is this pertinent to the case now before the court? Well, Justice Steikman, in this case, the objections were to foundation, hearsay, and anything else that might be a valid objection. I forget. Well, I don't know. Maybe this is, as you are suggesting, splitting hairs, but when I talk about foundation, I mean here's this document. It purports to be a letter or contract or whatever it is sent from X to Y. Now, in the absence of a request admitting that it's what it purports to be, someone's got to prove up, call X, I wrote this, I sent it, whatever. Correct. But to say it's hearsay, for instance, maybe the claim is it's admissible under a business record exception. Yes. That's a different matter. It might be hearsay unless the business record exception applies, and I'm not sure admitting the genuineness of the document would address the aspects of the business record exception. It wouldn't, would it? Well, Your Honor, I believe the purpose of 216 is to streamline litigation to the extent possible. And when documents are subject to a 216 request, and they are denied on basis such as hearsay and foundation, suddenly the purpose of 216 is defeated and a witness has to be called to say this is. But that's why God invented pretrial conferences, counsel. I mean, the trial judge says, okay, let's get here, we got this. You've admitted the foundation of this document. Mr. Schering, do you have any objections with regard to its admissibility? On what grounds? Why? Let's resolve them now. Well, that's why the 216 request was filed. But that's just kind of the first step. It seems to me that what we're talking about here is pretrial discovery stuff where you're called to the court's attention as we're preparing for hearing. We want to have a ruling on these documents in advance. Well, ultimately all the documents which were subject to 216 were admitted in trial through the evidence deposition of Ms. Macy. So basically I had to have the warm body witness to get those documents into evidence. Let me put it in a different way. Let's say that instead of adding this surplusage that you were talking about, including objections and so forth, they had just admitted each of those. Yours was a request to admit the genuineness of the document, and the other side just says admit, admit, admit. You'd be no better off when the time came for moving for admission of those but you had the responses that were actually made here. Because you would still, if facing an objection regarding relevance, objection regarding hearsay, you would have to establish the relevance or the non-hearsay nature of those documents. It wouldn't matter if they said admit for each of those. Well, in terms of hearsay, I think the admit would get around that if it is a document that is kept in the regular course of business. In terms of relevance, that's always going to be an issue with any document. Is it relevant to the case or not? But in terms of foundation and hearsay, I believe 216 should let you get past those objections and those issues. So frankly, what I am seeing is a whole lot of objections every time requests to admit were made. And there is really relatively sparse case law on 216 right now. So that's why I'm asking the court to address that point, because it is becoming an issue which I personally am seeing and I'm sure other practitioners are seeing this issue on a regular basis. So it looks like I am about out of time, so I will yield to Mr. Shearing. Thank you, gentlemen. Okay, thank you, Mr. Brenner. Mr. Shearing? May it please the Court, Mr. Brenner. First of all, in the manner that Mr. Brenner was discussing relative to 216, there was, in fact, a hearing on our objections, and at that time it was specifically addressed on the very issue of foundation as to whether or not they had to have someone appear and say this is, in fact, a document that is kept in the record of course of business. And our statement at that time to the Court, and the Court agreed that we are not objecting to that. We are objecting to what the document, in fact, stands for with its relevancy, whether or not those documents, in fact, show that Mr. Cramsey was voluntarily or involuntarily discharged from his employment. So I don't think that affected the Court's ruling to the point that they had admitted through their witness those documents. So they were there. We had an evidence deposition of one of the representatives from GSK, which would have had to happen anyway. So I think the question in this appeal is, again, looking at the manifest way that the evidence and Judge Willinghan's opinion in both parts, we have a situation where we have had extensive litigation in this case. It began in 2012, and now it's almost going on six years, and strictly relative to the issue of the monetary award and the issue of maintenance. And then the judgment for dissolution of marriage specifically indicates that the property, the land, some 652 acres that Mr. Cramsey was awarded, there was, in fact, a lien placed upon that to satisfy the appeal of maintenance. There's no question there is a statute that says that property of the payor of maintenance is subject to being assessed. In fact, the payor does not pay his maintenance. But in this situation, that was specifically put in there, and I drafted the order pursuant to the memorandum of opinion requesting, knowing of Mr. Cramsey's age, retirement or whatever, that since he had this land, that that would be subject to the future payments of maintenance. He can't make these payments any longer out of his income, can he? Out of his income, and that's an issue that was highly litigated. We believe that his income, if you just look at GSK, now that has ended. Much of the litigation in the last motion was based upon his potential income. He had 652 acres. He had rental property. He had CRP. He had the ability to find employment. CRP, what is that? CRP, I'm sorry. What is it? Land that he put into a federal program where he didn't have to farm it, he didn't have to do it. Also in doing that, he in fact tied up some of his land, but he has continued to do that. So he'd have to sell assets as opposed to his income? Assets, yes, or further farm. He had 652 acres that we maintained. He did not purposely put into production. This decision was in November of 2014. I don't know much about farming. I'm not sure. How does this work? How many acres, 650? No, he has 108, I believe. When you say he wasn't farming it, what do you mean by that? All of it, to his potential. He wasn't farming all of it? Yes. So how much was he not farming? The remainder, I guess. I mean, not all of it obviously was tillable, but we maintained that there was land that he could have farmed. There was land that was sold for hunting rights or leased for hunting rights. So your position argued to Judge Willihan was he had potential resources he wasn't pursuing? Yes. He had over $237,000 in farm equipment that he never used. He was only farming. He had 108 acres leased and there was about 40 acres that he was personally farming himself. So he had a lot of assets. He was awarded in the judgment 53% of the marital estate, as opposed to Ms. Ramsey receiving 47%. And that primarily had to do with the land. So Mr. Brenner argues there was no anticipation of him retiring. I think that shows there was some anticipation. Because he was given the bulk of the farmland. Was the trial court informed of the potential that Richard was not going to continue his employment with GSK prior to the dissolution judgment being entered? Oh, I'm sorry. Very sorry. Apologies. The judgment was entered in November of 2014. We had a hearing obviously sometime before that. That issue in and of itself at that time, at the time of the hearing, was not addressed. But in September of 2014, he received a notice from GSK, a final notice. And we have in evidence prior to that, he had warnings in regards to his proficiency and his employment. That was introduced by Mr. Cramsey's attorney at that time. So there was some evidence. In September, he received a final notice. Before the decision was even rendered, there was a motion to reconsider and also a motion to reopen, specifically in that he had received notification of his employment being terminated. What Mr. Cramsey had done is nothing. The request that he performed was like a final warning. So you need to bring up your worth ethics. He absolutely did nothing. What he did at that time is he really voluntarily resigned his position. He was supposed to receive this bonus, this severance package. And then after that, he took his short-term disability. So to answer your question, yes, it was. And then even before the judgment, there was a motion filed by Mr. Cramsey's attorney at that time stating that his employment was going to be terminated. Doesn't that lend credence to the trial court statements made following the hearing on the motion to modify? That the trial court had anticipated that Richard would no longer have the GSK income and that the trial court placed the lien on the marital or the parcels of land for the purposes of securing future maintenance benefits? Absolutely. Yes. I think that is what was exactly done. I mean, that specifically is why the lien on the land was put into the judgment. Else there was no really need to do that because we already had the statute saying if you don't pay your maintenance, you can come back and do something with what you were awarded. I mean, he was awarded over $3 million in marital assets. So this is not a situation where there's not the assets there. But he has done nothing, nothing since 2014 to enhance his income. You know, his income from GSK has ended. But there's other assets there that he has the ability to go out and earn the livelihood, use to sell seed. There's a lot of things that he did. Before the dissolution order was entered, I mean, he was working full-time with GSK and he also had the acreage. So when his employment ended with GSK, you know, he had 100 percent of his time to be devoted to farming, earning an income. He didn't do that. When he first filed this motion, it came to the appellate court based upon Judge Willingham's ruling to dismiss the request to terminate his maintenance based upon residue to cot. That was granted. And the appellate court here said, we need to go back and there has to be an evidentiary hearing where both parties have the right to cross-examine the witnesses and to have a full evidentiary hearing, which we have since we did that. I mean, a full hearing. It was well over a couple of days, I think, of evidence presented, not only attacking whether or not he was voluntarily or involuntary dismissed from his employment, but dismissing the request. And also the potential that he had to earn income. So those issues were fully litigated. Judge Willingham entered his opinion, sort of a two-pronged, number one, that he had the burden of proof. And I think he even mentioned that the evidence presented, if you're going to balance, was sort of equal. He also found that he did not sustain his burden. And the second part had to do with the lien on the property. So we believe that based upon what the trial court heard, he had the opportunity not only to review the testimony given at the hearing of the various witnesses and their credibility, but there's a long-standing evidence that has been presented on his income, his potential, and what he could do. And I think the court took all of that into consideration. So we're merely asking that the court deny the request for the reversal of his decision. Any other questions? Thank you. Thank you. Several points that I would like to address. I believe you, Justice Harris, asked about the 650-acre farm. The record shows that 350 acres of the farm was in CRP, which is subject to contract. When you put land in CRP, it stays in CRP for a period of time, depending on the actual contract. And if I am recalling correctly, there were 10 separate contracts covering different pieces of land. So in other words, 350 acres really couldn't be improved, as Mr. Shearing suggests. The testimony was between 124 and 130 acres were in pasture, 40 acres were being farmed, and the rest was brush. In other words, could improvement be made, as Mr. Shearing suggests? The answer is maybe, but we're talking something that would take place over many, many years. In terms of what Justice Steigman asked, would Richard Cramsey be forced to sell land to continue to make this maintenance obligation? And the answer is yes, because current income shift simply isn't there. ESK was two-thirds of what this man was making. If he is forced to sell farmland, what we are in effect doing is doing property division again more than 30 days after the judgment was entered. So I believe that that just is not the way things should be. I think that when maintenance is set based on income, and then to backpedal and say, well, there were assets, we're in effect re-dividing the assets from the original judgment for disability. I threw into my original brief an interesting quote from the Shin case, which says, Permanent does not mean everlasting. A better description would be indefinite. An award of permanent maintenance may be modified or terminated as provided by Section 510. What we have here is a guy who lost a job paying nearly 130 grand a year. He didn't retire. He was forced out. He was forced out along with hundreds of other folks. So to say that he could not have his maintenance modified based on losing that substantial of a piece of income really puts him in a position where permanent does mean everlasting. Is he to continue to pay this until the day he dies by selling off the farm? I think that if the trial court's order stands, that is the result here, and I do not believe that is the result intended by 510. Thank you.